IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–00617–EWN

PEGGY S. BROWN,

      Plaintiff,

v.

JO ANNE B. BARNHART,
Acting Commissioner of Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

This is a social security benefits appeal under 42 U.S.C. § 405(g) (2005).  Plaintiff Peggy

Brown challenges the final decision of the Commissioner of Social Security (the "Commissioner")

denying her applications for disability insurance benefits and supplemental security income

benefits.  Jurisdiction is based on 42 U.S.C. § 405(g).

**FACTS**

*1.*    *Medical Evidence*

    *a.*    *Medical Evidence Before the Administrative Law Judge*

Plaintiff was born on May 8, 1958, and was forty-four years old on the onset date of her

disability.  (Admin. R. at 63 [filed May 23, 2005] [hereinafter "Admin. R."].)  Plaintiff has the

equivalent of a high school education, and completed one year of college to become a licensed

practical nurse.  (*Id.* at 73, 300.)  Plaintiff worked in the vocationally relevant past as a nurse and

waitress.  (*Id.* at 68, 80, 124.)  Plaintiff alleges that she became unable to work beginning on May

11, 2002 due to chronic pain in her neck, upper back, and lower back.  (*Id*. at 67.)

On September 12, 2001, Plaintiff presented to Milton C. Dewhirst, M.D. with complaints

of head and chest congestion, neck pain, and headaches.  (*Id.* at 133.)  Plaintiff stated that she

smoked one pack of cigarettes per day, except for the week before her examination, during which

she smoked one-half pack of cigarettes per day.  (*Id.*)  Upon examination, Dr. Dewhirst found

that Plaintiff had no cervical muscular tenderness, but left lateral flexion aggravated Plaintiff's

right-side neck pain.  (*Id.*)  Plaintiff's cardiac examination was normal.  (*Id.*)  Dr. Dewhirst

diagnosed Plaintiff with: (1) acute exacerbation of chronic bronchitis; (2) probable chronic

obstructive pulmonary disease ("COPD"); and (3) neck pain, probably myofascial in nature.[1]  (*Id.*)

Dr. Dewhirst counseled Plaintiff on smoking cessation and prescribed medications for her

bronchitis.  (*Id.*)

From October 22, 2001 to December 10, 2001, Plaintiff received chiropractic treatment

from Scott D. Jones, D.C.  (*Id.* at 153–72.)  The record reflects that Plaintiff visited Dr. Jones at

least twelve times during the aforementioned six-week period.  (*Id.*)

On December 27, 2001, Plaintiff visited her primary care physician, Daniel R. Fellhauer,

M.D., for continuing neck pain, despite her chiropractic treatments.  (*Id.* at 131.)  Upon

examination, Plaintiff: (1) had a decreased range of motion in flexion, extension, and turning to

the right; (2) had no masses; (3) experienced tenderness along the right posterior cervical

---

[1]The term myofascial refers specifically to the fasciae, which are thin, tough membranes
that surround individual muscles.  4-M Attorneys' Dictionary of Medicine 7177 (Matthew Bender
2005).

musculature, but no anterior tenderness; (4) had a full range of motion of the upper extremities; and (5) had symmetric sensation and symmetric strength, except mild decreased strength in the right triceps. (*Id.*) Dr. Fellhauer diagnosed Plaintiff with probable cervical radiculopathy and prescribed pain medication.[2] (*Id.*)

On January 7, 2002, a magnetic resonance imaging ("MRI") of Plaintiff's cervical spine revealed evidence of muscle spasms and mild degenerative changes at C3–4, C 5–6, and C 6–7, but no disc herniation. (*Id.* at 130, 151–52.) On January 10, 2002, Plaintiff presented to Dr. Fellhauer complaining of increased pain in her upper back, especially on the right side. (*Id.* at 130.) Dr. Fellhauer noted the January 7, 2002 MRI results, and found that Plaintiff: (1) experienced moderate pain in her neck with flexion and extension, with more noticeable pain upon turning; (2) experienced tenderness of the upper thoracic spinous processes and of the right trapezius, but no tenderness of the posterior cervical muscular or C-spinous areas; (3) had sensation intact in the right upper extremity; and (4) did not have a herniated disc. (*Id.*) Dr. Fellhauer recommended that Plaintiff visit a pain specialist and recommence taking Flexeril, a muscle relaxant that Plaintiff had previously been prescribed. (*Id.*)

On May 21, 2002, Plaintiff presented to Dr. Fellhauer complaining of a "flare of neck pain" and requesting time off from her work as a waitress. (*Id.* at 129.) Dr. Fellhauer noted that a March 7, 2002 eletromyographic ("EMG") study of Plaintiff's upper extremity was normal. (*Id.*) Upon examination, Plaintiff: (1) had a decreased range of motion of the neck in all directions; (2) experienced tenderness over the posterior cervical musculature and spinous

---

[2]Cervical radiculopathy is the disease or abnormality of a spinal nerve root at its origin in the cervical spine. 1-C Attorneys' Dictionary of Medicine 3925 (Matthew Bender 2005).

processes; and (3) had a full range of motion of the upper extremities without pain. (*Id.*) Dr. Fellhauer diagnosed Plaintiff with chronic cervical pain syndrome, prescribed pain medication, recommended that Plaintiff continue her exercise program, and excused Plaintiff from work for ten days. (*Id.* at 129, 142.)

On July 29, 2002, Plaintiff visited Dr. Fellhauer for a complete physical examination. (*Id.* at 127.) Dr. Fellhauer noted that Plaintiff fell in May 2002 and injured her low back, did not exercise regularly, and smoked one-half to one full pack of cigarettes per day. (*Id.*) Upon examination, Plaintiff's sensory and strength examinations were normal, Plaintiff experienced moderate tenderness in the lumbosacral area, and Plaintiff exhibited a moderately limited range of motion of the neck in all directions. (*Id.*) Dr. Fellhauer found that Plaintiff had chronic neck pain, recent low back pain, menopausal symptoms, and dyspepsia with heartburn. (*Id.*) Dr. Fellhauer prescribed pain medications and referred Plaintiff to Dr. Sandell for re-evaluation of her neck pain. (*Id.*) On August 6, 2002, Dr. Fellhauer opined that Plaintiff was unable to work due to chronic back and neck pain. (*Id.* at 142.)

On January 30, 2003, Plaintiff visited John Marta, M.D. (*Id.* at 147–49.) Upon examination, Dr. Marta found that Plaintiff was in acute distress and held her neck to the right side with a significant degree of guarding. (*Id.* at 147.) Dr. Marta reported that Plaintiff had weaker grip strength on the right side and had decreased sensation over the C5 level on the right side. (*Id.* at 147–48.) Dr. Marta issued Plaintiff a cervical epidural block with steroids. (*Id.* at 147.) On February 5, 2003, Plaintiff returned to Dr. Marta for a second cervical epidural block with steroids. (*Id.* at 146.) Plaintiff reported that the first block had dramatically improved her

pain for about a week.  (*Id.*)  Dr. Marta performed the procedure and advised Plaintiff to return

for a third block only if Plaintiff deemed it necessary.  (*Id.*)

On April 11, 2003, neurosurgeon Michael W. Brown, M.D. evaluated Plaintiff.  (*Id.* at

180, 185.)  Upon examination, Plaintiff's cranial nerves were intact, sensory examination was

unremarkable, and motor examination was normal with "some poor input and giveaway type

weakness."  (*Id.* at 180.)  Plaintiff had no gait or station disturbance.  (*Id.*)  Dr. Brown noted that

Plaintiff cried nearly constantly throughout the examination.  (*Id.*)  Dr. Brown ordered another

MRI of Plaintiff's cervical spine, and recommended that Plaintiff seek psychiatric treatment.  (*Id.*)

On May 5, 2003, Dr. Brown re-examined Plaintiff and reviewed the recent MRI.  (*Id.* at

179.)  The MRI revealed disc herniation and nerve root compression in Plainitff's spine at C 5–6

and C 6–7.  (*Id.* at 179, 186, 189.)  Dr. Brown found that Plaintiff had weakness in her triceps

and a markedly diminished triceps reflex.  (*Id.* at 179.)  Dr. Brown opined that surgical

intervention was appropriate in Plaintiff's case.  (*Id.*)  On May 20, 2003, Dr. Brown performed an

anterior cervical discectomy, interbody arthrodesis, and anterior plating.  (*Id.* at 181–84.)

On May 27, 2003, Plaintiff visited Dr. Brown for a postsurgical follow-up examination.

(*Id.* at 178.)  Plaintiff requested more pain medication and reported that her severe shooting pain

in her right extremity had been replaced by a dull achiness.  (*Id.*)  On August 18, 2003, Plaintiff

made another follow-up visit to Dr. Brown, with complaints that she continued to experience

neck and arm pain, exacerbated by turning her head.  (*Id* at 177.)  Plaintiff's X-rays revealed good

bony alignment and good screw and plate placement.  (*Id.*)  Dr. Brown's examination of Plaintiff

revealed normal strength without any reflex asymmetry.  (*Id.*)  Dr. Brown recommended physical

therapy for Plaintiff.  (*Id.*)

From August 25, 2003 to September 9, 2003, Plaintiff attended five physical therapy

sessions. (*Id.* at 191–99.) Therapist's notes from Plaintiff's fifth session reveal that although

Plaintiff had been consistently attending physical therapy sessions and using a spinal stimulator at

home, Plaintiff had experienced minimal change and suffered from "a good deal of discomfort in

her neck frequently accompanied by twitching/muscle spasms." (*Id.* at 191.)

On September 8, 2003, Dr. Fellhauer wrote a letter to the administrative law judge

("ALJ") assigned to Plaintiff's case, and stated that Plaintiff was "unable to engage in any type of

gainful employment because of her chronic neck pain." (*Id.* at 190.)

### b.      *Additional Medical Evidence Submitted to the Appeals Council*

On February 5, 2002, Plaintiff visited pain specialist Timothy V. Sandell, M.D. (*Id.* at

233–36.) Dr. Sandell found that Plaintiff had: (1) no obvious spinal misalignment; (2) slightly

decreased range of motion in right rotation; and (3) increased pain with extension versus flexion.

(*Id.* at 234.) Dr. Sandell recommended an EMG study and diagnosed Plaintiff with cervical and

thoracic myofascial pain and intermittent right upper extremity radicular symptoms. (*Id.* at 235.)

On March 7, 2002, Dr. Sandell performed an EMG study of Plaintiff's upper extremity. (*Id.* at

237–38, 242–43.) Dr. Sandell reported that the EMG results were within normal limits and

revealed no evidence of peripheral nerve entrapment, peripheral neuropathy, cervical nerve root

irritation, brachial plexopathy, or cervical radiculopathy. (*Id.* at 238.) Dr. Sandell referred

Plaintiff to physical therapy and recommended conservative treatment. (*Id.* at 239.)

On April 17, 2003, an MRI of Plaintiff's cervical spine revealed mild degenerative

changes at C 5–6 and C 6–7 disc spaces with disc bulge/herniation causing neural canal stenosis

with mild cord compression, but with no significant change since the January 7, 2002 MRI. (*Id.*

at 214–15.)  The April 17, 2003 MRI also revealed mild degenerative changes of the C 3–4 disc

space, with left-sided neural foraminal narrowing slightly worse than noted by the January 7, 2002

MRI.  (*Id.* at 215.)

From September 24, 2003 through January 30, 2004, Plaintiff attended thirteen individual

outpatient psychotherapy sessions with Sharron Johnson, M.A., L.P.C.  (*Id.* at 231.)  Johnson

diagnosed Plaintiff with major depressive disorder, recurrent with various medical complications.

(*Id.*)  On January 19, 2004, Plaintiff visited Dr. Fellhauer for a "depression recheck."  (*Id.* at 253.)

Dr. Fellhauer noted that Plaintiff was enjoying "significant benefit" from the medications Zoloft

and Wellbutrin.  (*Id.*)  On January 30, 2004, Plaintiff exhausted her insurance coverage for

sessions with Johnson.  (*Id.*)

On December 23, 2003, Dr. Sandell opined that although Plaintiff continued to have

cervical pain, the cervical surgery was successful and had allowed Plaintiff to regain upper

extremity strength.  (*Id.* at 240.)  Dr. Sandell adjusted Plaintiff's medications and instructed

Plaintiff to continue with physical therapy.  (*Id.*)  On January 9, 2004, Plaintiff visited Dr. Sandell,

and reported no significant change in her condition.  (*Id.* at 241.)  Dr. Sandell opined that

Plaintiff's depression was a "significant contributing factor" in Plaintiff's pain control.  (*Id.*)

On March 18, 2004, Plaintiff visited physician's assistant Lynnette Groeger, PA-C for

"routine health maintenance."  (*Id.* at 213.)  Groeger noted that Plaintiff was experiencing

"problems with depression" due to a change in medication.  (*Id.*)  Groeger adjusted Plaintiff's

medications and referred Plaintiff for another MRI of the cervical spine.  (*Id.*)

### 2.    *Procedural History*

On August 26, 2002, Plaintiff filed applications for disability insurance benefits and supplemental security income benefits.[3]  (*Id.* at  63–65, 200–03)  On December 11, 2002, the Social Security Administration denied Plaintiff's applications.  (*Id.* at 48.)  On January 29, 2003, Plaintiff requested a hearing before an ALJ.  (*Id.* at 47.)  On September 4, 2003, the ALJ held a hearing, at which Plaintiff appeared *pro se* and at which Plaintiff and vocational expert ("VE") Dennis Duffin testified.  (*Id.* at 294–310.)

Plaintiff testified that she experienced pain at the back of her neck, across her shoulders, down her spine, down her right arm, and occasionally in her low back and hips.  (*Id.* at 301–02, 304.)  Plaintiff stated that her pain was the same before and after surgery, and approximately two or three times a month, her pain was sufficiently severe to cause her to remain in bed for two or three days.  (*Id.* at 301, 303–04.)  Plaintiff testified that she was undergoing physical therapy, but it had not alleviated her pain.  (*Id.* at 302.)  Plaintiff testified that she took muscle relaxants and analgesic medications three to four times a day, which help her pain "a little bit."  (*Id.* at 302–03.)  Plaintiff testified that: (1) she could lift five to ten pounds, and lifting more than ten pounds exacerbated her pain; (2) she had not driven much since her surgery, because driving exacerbated her pain and she was afraid to drive due to lack of control; (3) walking too much, getting groceries, and "maybe doing laundry" all exacerbated her pain; and (4) she could not mop because of her neck and back pain.  (*Id.* at 300, 303–05.)  Plaintiff testified that she was "really

---

[3]August 26, 2002 is Plaintiff's protective filing date, Plaintiff's applications reflect the date September 27, 2002.  (Admin. R. at 20, 63–65, 200–03; Def.'s Resp. Br. at 1 [filed Aug. 16, 2003].)

depressed," but she had not received psychiatric or psychological treatment, although her doctors

had recommended that she do so.  (*Id.* at 305.)

The VE testified at the hearing regarding his review of  Plaintiff's vocational history on

file.  (*Id.* at 306–08.)  The VE testified that Plaintiff's past work: (1) as a waitress was a skill level

three occupation requiring a light exertional level; and (2) as a nurse was a skill level six

occupation requiring a medium exertional level.  (*Id.* at 307.)  The VE testified that an individual

similarly situated to Plaintiff — an individual of the same age and educational background as

Plaintiff, limited to an exertional level of a full range of light work with nonexertional limitations

of no above chest-level work; occasional bending, squatting, kneeling and climbing; occasional

turning or flexing the neck; and avoiding moving machinery — could not perform Plaintiff's past

work, but could perform light work as a video rental clerk, telemarketer, or light/small products

assembler.  (*Id.* at 307–08.)  The VE opined that an individual subject to the aforementioned

limitations along with the additional limitation of an unpredictable inability to perform any work

activity for six to nine days per month due to pain would not be suitable for full-time employment.

(*Id.* at 308–09.)

On February 18, 2004, the ALJ issued his decision, in which he determined that Plaintiff

was not disabled within the meaning of the Social Security Act.  (*Id.* at 20–28.)  The ALJ

determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of

light work available in significant numbers in the national economy.  (*Id.* at 20, 25.)

In reaching his conclusion, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since May 11, 2002.  (*Id.* at 21–22.)  The ALJ determined that Plaintiff had

medically determinable, severe impairments in the form of pain in her neck, back and both

shoulders.  (*Id.* at 21, 25.)  Although these impairments are "severe," the ALJ determined that

Plaintiff's impairments were not sufficiently severe to meet or equal any of the listings in

Appendix 1, Subpart P, Regulations No. 4.  (*Id.* at 25.)  The ALJ also found that Plaintiff was not

fully credible.  (*Id.*)

Based on the evidence presented, the ALJ issued his RFC determination.  The ALJ

concluded that Plaintiff:

> retains a [RFC] for lifting and carrying [ten] pounds frequently, [twenty] pounds
> occasionally.  She can frequently sit, stand and walk and she can occasionally bend,
> squat, kneel and climb in jobs where she can avoid work over the chest level.  She is
> afforded a limitation to jobs where she can avoid moving machinery and jobs that do
> not require more than occasional turning or flexing of the neck.

(*Id.* at 26.)  In accord with this RFC, the ALJ determined that Plaintiff could not perform her past

relevant work.  (*Id.*)  The ALJ further determined that Plaintiff could still successfully perform a

significant number of jobs in the local and national economy.  (*Id.* at 20.)  Therefore, the ALJ

found that Plaintiff was not disabled.  (*Id.*)

On April 2, 2004, Plaintiff requested a review of the ALJ's decision.  (*Id.* at 15.)  In

connection with the request for review, Plaintiff submitted additional medical records to the

Appeals Council that were not available to the ALJ.  (Pl.'s Opening Br. at 2 [filed June 23, 2005]

[hereinafter "Pl.'s Br."]; Admin. R. at 210–93.)  On March 15, 2005, the Appeals Council

affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial

review.  (Admin. R. at 3–5.)  On April 4, 2005, Plaintiff filed a complaint in this court challenging

the Commissioner's denial of disability and supplemental social security income benefits.  (Compl.

-10-

[filed April 4, 2005].)  On June 23, 2005, Plaintiff filed her opening brief.  (Pl.'s Br.)  This matter

is fully briefed.[4]

## ANALYSIS

### *1.      Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this court's review is limited to determining whether the record as a

whole contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v.*

*Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The court must

uphold the Commissioner's decision if it is supported by substantial evidence.  *See Dollar v.*

*Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence, nor may it

substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.

---

[4]On January 17, 2006, Defendant filed an unopposed motion to remand.  (Def.'s
Unopposed Mot. to Remand [filed Jan. 17, 2006].)  I do not address Defendant's motion, as this
order renders it moot.

1987).  That does not mean, however, that my review is merely cursory.  To find that the ALJ's

decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*,

816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting

it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to

reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th

Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.     *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In proving her disability, a claimant must make a

*prima facie* showing that she is unable to return to the prior work she has performed.  *Huston v.*

*Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the

Commissioner must show that the claimant can do other work activities and that the national

economy provides a significant number of jobs which the claimant could perform.  *Frey*, 816 F.2d

at 512.

The Commissioner has established a five-step process to determine whether a claimant

qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2005); *Bowen v. Yuckert*,

482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded. *See*  20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.

1988).  First, the claimant must demonstrate that she is not currently involved in any substantial

gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must show a medically severe

impairment (or combination of impairments) which limits her physical or mental ability to do basic

work activities. *Id.* § 404.1520(c).  At the third step, if the impairment matches or is equivalent

to established listings, then the claimant is judged conclusively disabled.  20 C.F.R. §

404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis

proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents

her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations

omitted).  If the claimant is able to perform her previous work, she is not disabled. *Id.*; 20 C.F.R.

§ 404.1520(e).  If the claimant is unable to perform her previous work, the analysis progresses to

the fifth and final step.  The fifth step requires the Commissioner to demonstrate that: (1) the

claimant has the RFC to perform other work based on the claimant's age, education, past work

experience, and (2) there is availability of that type of work in the national economy. *See* 20

C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

### *3.*     *Disability Determination*

Plaintiff sets forth three arguments in support of her contention that the ALJ's decision is

erroneous.  (Pl.'s Br. at 10.)  First, Plaintiff argues the ALJ improperly evaluated Plaintiff's

medical evidence and the opinions of Plaintiff's physicians.  (*Id.* at 10, 11–25.)  Second, Plaintiff

argues the ALJ erred in assessing her credibility.  (*Id.* at 10, 25–26.)  Third, Plaintiff argues that

the ALJ failed to submit proper hypothetical questions to the VE.  (*Id.* at 10, 27–28.)  I need only

address the first argument.

### a.      *Plaintiff's Physicians' Opinions and Medical Evidence*

Plaintiff argues that the ALJ erred at step three in assessing Plaintiff's physicians' opinions

and in determining that Plaintiff's impairments did not meet or equal the listings, specifically

Listing 1.04A.[5]  (Pl.'s Br. at 11–26; Pl.'s Reply Br. at 3, 4 [filed Aug. 29, 2005] [hereinafter "Pl.'s

Reply"].)  The ALJ found that Dr. Fellhauer's opinions were "conclusory" and "excessive in light

of the generally normal objective findings in the clinical record," and accorded the opinions no

weight.  (Admin. R. at 25–26.)   Plaintiff argues that the ALJ was required to give controlling

weight to Dr. Fellhauer's opinions because they were consistent with other substantial evidence in

the record.  (Pl.'s Br. at 23–24.)

In assessing the amount of weight to accord the opinion of a claimant's treating physician,

an ALJ must first decide whether the opinion merits controlling weight.  *Watkins v. Barnhart*, 350

F.3d 1297, 1300 (10th Cir. 2003).  An ALJ is required to give a treating physician's opinion

controlling weight if it is: (1) "well-supported by medically acceptable clinical and laboratory

diagnostic techniques;" and (2) "consistent with other substantial evidence in the record."  *Id.*

---

[5]Plaintiff filed subsequent applications for disability insurance benefits and supplemental
security income on March 25, 2004, alleging that she had been disabled since May 21, 2002.  On
December 22, 2005, an ALJ found that Plaintiff was under a disability beginning February 19,
2004 — the day after the ALJ's decision in the matter before this court.  The subsequent ALJ also
held that Plaintiff's impairments did not meet the listings.  (Decision at 3, 4 [filed December 22,
2005].)

(citation omitted).  "[I]f the opinion is deficient in either of these respects, then it is not entitled to

controlling weight."  *Id.* (citation omitted).  If an ALJ determines that the opinion is not entitled

to controlling weight, "[t]reating source medical opinions are still entitled to deference and must

be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Id.* (internal

citations and quotation marks omitted).  Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to which
> the physician's opinion is supported by relevant evidence; (4) consistency between
> the opinion and the record as a whole; (5) whether or not the physician is a
> specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301; *see* 20 C.F.R. §§ 404.1527 and 416.927.  Upon consideration of these

factors, an ALJ must state "good reasons" for the weight he ultimately assigns the opinion.

*Watkins*, 350 F.3d at 1301 (internal citation and quotation marks omitted).  "Finally, if the ALJ

rejects the opinion completely, he must then give specific, legitimate reasons for doing so."  *Id.*

(internal citation and quotation marks omitted).  Here, the ALJ has failed to give specific,

legitimate reasons for rejecting Dr. Fellhauer's opinions.

    The ALJ rejected Dr. Fellhauer's opinions as "conclusory."  (Admin. R. at 25.)  It is well-

established that a "treating physician's opinion may be rejected if [the] conclusions [therein] are

not supported by specific findings."  *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d

1027, 1029 (10th Cir. 1994); *see Frey*, 816 F.2d at 513 (a "physician's opinion [may] be rejected

if it is brief, conclusory, and unsupported by medical evidence"); *Musgrave v. Sullivan*, 966 F.2d

1371, 1374 (10th Cir. 1992) (evidence is not substantial if it constitutes mere conclusion);

*Hardman v. Barnhart*, 362 F.3d 676, 680 (10th Cir. 2004) (same).  Here, Dr. Fellhauer's

conclusions are consistently based upon his own medical examinations of Plaintiff, as well as upon

medical tests, including EMG and MRI results.  (Admin. R. at 127, 129, 130, 131.)  Thus, I find

the ALJ erred in deeming Dr. Fellhauer's opinions conclusory, and further erred in rejecting the

opinions on that basis.

The ALJ also stated that Dr. Fellhauer's opinions were "excessive" in light of Plaintiff's

medical records, and underscored  Dr. Fellhauer's willingness to offer "a statement precluding all

work when [Dr. Fellhauer] ha[d] not actually examined [Plaintiff] in over a year."  (Admin. R. at

25–26.)  The ALJ's error is two-fold.  First, "in choosing to reject the treating physician's

assessment, an ALJ may not make speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of contradictory medical evidence and not

due to his or her own credibility judgments, speculation or lay opinion."  *Langley v. Barnhart*,

373 F.3d 1116, 1121 (10th Cir. 2004) (citing *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 [10th

Cir. 2002]).  Here, the ALJ impermissibly speculated that Dr. Fellhauer's opinions were

"excessive" and based his rejection of the opinions on the basis of that speculation, rather than

contradictory medical evidence.  (Admin. R. at 25.)  Second, the ALJ erroneously based his

decision to reject the opinions of Dr. Fellhauer — who has been  Plaintiff's treating physician for

over a decade — upon Dr. Fellhauer's willingness to attest to Plaintiff's inability to work, despite

not having examined Plaintiff for a year.  (Admin. R. at 25–26, 190.)  As the trier of fact, an ALJ

may consider a physician's bias, but "the ability to consider bias . . . is not synonymous with the

ability to blithely reject a treating physician's opinion or to discount that physician's opportunity

to have observed the claimant over a long period of time."  *Micus v. Bowen*, 979 F.2d 602, 607

(7th Cir. 1992).  Indeed, a treating physician's opinion is not subject to a presumption of bias for

-16-

which it can be discounted.  *See Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993).

Similarly, the Tenth Circuit has held that the fact that a physician "naturally advocates his

patient's cause" was not a proper basis for an ALJ to reject a treating physician's opinion.  *Frey*,

816 F.2d at 515.

Accordingly, I find that the ALJ decision to reject Dr. Fellhauer's opinions was not

supported by substantial evidence.  The fate of Plaintiff's other arguments is inextricably

entangled with that of Dr. Fellhauer's opinion.  Determinations regarding the severity of Plaintiff's

impairments, Plaintiff's credibility, and the propriety of questions posed to the VE describing

Plaintiff's impairments will necessarily be affected by the ALJ's acceptance or rejection of Dr.

Fellhauer's opinions.  Therefore I do not address Plaintiff's other arguments at this time.  On

remand, the ALJ should consider and weigh Dr. Fellhauer's opinions or offer "specific, legitimate

reasons" for disregarding them.  *See Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

### 4.    Conclusion

Based on the foregoing it is therefore

ORDERED that the Commissioner's decision is REVERSED and REMANDED for

proceedings consistent with this opinion.  Defendant's unopposed motion to remand (#18) is

DISMISSED as moot.

Dated this 19th day of January, 2006.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge

-17-